794 F.2d 871
 COMPAGNIE DES BAUXITES DE GUINEA
v.
INSURANCE COMPANY OF NORTH AMERICA, the Insurance
Corporation of Ireland, Ltd., Metcantile & General
Reinsurance Co., Ltd., Hanover Eagle Star Insurance Co.,
Ltd., Hanover Insurance Company, Continental Assurance
Company of London, Ltd., the Century Insurance Co., Ltd.,
Yuval, the Insurance Company of Israel, Ltd., Home Insurance
Co., Ltd., Slater Walker Insurance Company, Ltd., Yasuda
Fire & Marine Insurance Company (UK) Ltd., Nichido Fire &
Marine Insurance Co., Ltd., Turegum Insurance Company, Sahar
Insurance Co., Ltd., Excess Insurance Co., Ltd., Trident
Insurance Co., Ltd., Vesta (UK) Ltd., Chiyoda Fire & Marine
Insurance, Ltd., Tokyo, Stronghold Insurance Co., Ltd.,
British Reserve Insurance Co., Ltd., English & American
Insurance Co., Ltd., Consolidated European Reinsurance Co.,
Ltd. & L'Union Atlantique Sa D'Assurances Brussels, all
being corporations.
Appeal of INSURANCE COMPANY OF NORTH AMERICA, Appellant in 85-3598.
Appeal of COMPAGNIE DES BAUXITES DE GUINEA, Appellant in 85-3629.
 Nos. 85-3598, 85-3629.
 United States Court of Appeals,
Third Circuit.
 Argued June 17, 1986.
Decided July 8, 1986.
 
 Stephen R. Mlinac (argued), Randall J. McConnell, Dickie, McCamey and Chilcote, Pittsburgh, Pa., Richard M. Shusterman, Thomas A. Allen, White and Williams, Philadelphia, Pa., for Insurance Co. of North America.
 Cloyd R. Mellott (argued), Robert W. Doty, Andrew M. Roman, Larry K. Elliott, Mark J. Murphy, Eckert, Seamans, Cherin and Mellott, Pittsburgh, Pa., for Compagnie des Bauxites de Guinea.
 Before SEITZ, HUNTER, and MANSMANN, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 I. BACKGROUND
 
 1
 Compagnie Des Bauxites de Guinea ("CBG") is a multi-national corporation owned 49% by The Republic of Guinea and 51% by Halco Mining, Inc. ("Halco"). Halco is owned by the world's six largest aluminum producers. In 1969, CBG's predecessor began constructing the Boke Project, a facility to mine and process bauxite in Guinea. The first production year for the Boke Project began on October 1, 1973. The bauxite from Guinea was supplied to the aluminum companies owning Halco.
 
 
 2
 CBG mines bauxite in the interior of Guinea at Sangaredi and transports it by railway to the processing and shiploading facility at Kamsar, on the coast of Guinea. At Kamsar, the railroad ore cars are raised and the ore unloaded onto conveyors known as the "pan feeders." The bauxite is moved to the tippler building, a ninety-five foot high, reinforced concrete structure, where it is crushed. The crushed ore is then dried if necessary. A bucket wheel picks up the dried ore, which is then loaded onto ships at a dock connected to the processing facility.
 
 
 3
 CBG obtained an insurance policy, with a liability limit of ten million dollars, for business interruption loss coverage from the Insurance Company of North America ("INA"). INA's place of incorporation and principal place of business is Pennsylvania. The initial and renewal policy term was from February 12, 1974 to June 1, 1975. The policy insured against "losses resulting directly from necessary interruption of business caused by damage to or destruction of real or personal property."
 
 
 4
 Before beginning its first year of operations, CBG entered into contracts to supply 4.7 million metric tons of bauxite during its first production year, the period from October 1, 1973 to September 30, 1974. However, during this first year, CBG shipped only about 3.6 million metric tons of bauxite and canceled several shipments. CBG entered into contracts to supply 6.8 million metric tons of bauxite during its second production year, which began on October 1, 1974.
 
 
 5
 On September 2, 1974, CBG discovered cracks in the tippler building. Mr. Hercules Pappas, the president of CBG, went to Guinea to review the problem with CBG's engineers. On September 16, 1974, Pappas concluded that there were serious problems with the structural integrity of the building and that crushing, and therefore shipments, of bauxite would have to be curtailed to avoid the building's collapse. He immediately canceled a great number of bauxite shipments.
 
 
 6
 Pappas testified that he canceled the shipments because of the cracks and not, as INA contended, for other reasons that were known before the discovery of the cracks. CBG's engineers had told Pappas to minimize production. Pappas admitted that he had overreacted by canceling so many shipments. Crushing and shipments during October, November, and December 1974 were higher than Pappas had anticipated after seeing the cracks, but were lower than CBG had projected before it knew about the cracks. Crushing during these three months was greater than it had been in any month in the first production year. CBG testified, however, that they had reasonably expected production to be significantly greater in the second year and that the actual crushing done, while greater than the first year's amount, was still much lower than their expectation. In its first year of production, less than 400,000 metric tons were crushed each month in all but one month. In October, November, and December 1974, CBG crushed between 450,000 and 475,000 metric tons per month. In May 1975, the first month of crushing after the tippler building was fully restored, CBG crushed 675,000 metric tons of bauxite. CBG had planned to crush over 500,000 metric tons per month in its second year of production. CBG was able to reinstate a number of the canceled shipments.
 
 
 7
 There was no crushing done from early January 1975 to April 18, 1975. During this time, the tippler building was repaired. CBG continued to make some shipments of bauxite by using its inventory. CBG contended that over the period from September 1974 to April 1975, it lost sales of 1,291,000 metric tons of bauxite. While restoring the tippler building, CBG also restored the mechanical pan feeder system's support. At trial, INA contended that the down-time did not result primarily from cracks in the tippler building but from a variety of other problems including a shortage of storage space, electrical repairs, mechanical repairs, a delay while waiting for raw bauxite, breakdowns of the pan feeders, and a need to redesign the tippler building and the pan feeder system.
 
 
 8
 CBG notified INA of its business interruption loss claim in June 1975. The district court found that INA received notice of the claim as of January 1975, when INA gained access to a report by Donald Mars, an international claims adjuster. In November 1974, another insurance company had sent Mars to the Boke facility to investigate a property damage claim with respect to the tippler building. While he was there, Mars also investigated, on behalf of INA, CBG's business interruption claims arising from damage to Bucket Wheel No. 3 and from a train derailment.
 
 
 9
 On January 23, 1975, Mars met with J.J. Gelinas, an employee in INA's European Head Office in Brussels. They met to discuss the train collision claim. On the basis of the meeting, Gelinas prepared a memo which was given to John Stel, the senior officer at INA's international claims subsidiary in Philadelphia. Gelinas wrote the memo under the caption of the train collision loss, but discussed the cracks in the tippler building and the expected loss of production.
 
 
 10
 On December 11, 1975, CBG brought suit against INA and the excess insurers seeking recovery under its business interruption insurance policy for losses due to damage to the tippler building. In two other suits, CBG made claims under the same policy for losses due to a train collision and to an accident with the reclaiming machine, Bucket Wheel No. 3. The three suits were consolidated for pretrial matters and discovery was conducted from 1975 to 1982. CBG recovered only $72,273.00 in the train collision action. See Compagnie Des Bauxites de Guinee v. Insurance Co. of North America, 721 F.2d 109 (3d Cir.1983). The jury found for INA on the bucket wheel action, which had been tried on the issue of damages before the same jury that considered the instant case.
 
 
 11
 The court scheduled trial in the instant case for November 1982 but on January 19, 1983 the district court granted summary judgment in favor of INA, finding that the damage to the tippler building was not fortuitous. This court reversed and remanded for trial on the merits. On remand, the bucket wheel case and the tippler case were consolidated. The six-week non-jury trial began on February 11, 1985. A jury trial was held, to determine damages, from April 9, 1985 to May 8, 1985. The jury returned a verdict in favor of INA on the bucket wheel claim but, in favor of CBG on the tippler building claim. They determined that CBG had suffered a loss of 935,250 metric tons of bauxite. Based on the stipulated value of bauxite, the trial judge calculated an actual loss of $10,701.526. He entered judgment for CBG for the policy's limit of $10,000,000 and awarded prejudgment interest at a rate of six percent from April 18, 1975 to May 15, 1985 for a total judgment of $16,044,383.56.
 
 II. NOTICE OF LOSS
 
 12
 The district court held that "notice to INA on January 24, 1975 was reasonable in time and form under the circumstances." INA claims that the notice of loss required by the policy was not obtained by INA until June 1975 when CBG sent them a letter regarding their business interruption loss claim. INA asserts 1) that CBG was required to give notice within sixty days of September 2, 1974, the date on which it discovered the cracks; 2) that information from a third party does not constitute notice; 3) that Mars's January 1975 report contained insufficient information to give INA notice of a potential business interruption loss claim.
 
 
 13
 The district court ruled that INA had received notice on January 24, 1975 through Mars's report. We do not believe that the district court erred in making this finding. Gelinas' report to Stel contained the following passage:
 
 
 14
 It appears that some months ago one of the engineers of CBG from their Head Office, while visiting the site, noticed that this particular building was cracked, which he considered a very serious situation. He discussed this problem with the engineer in charge, who replied that this was only shrinkage in the cement. The man was immediately fired and replaced, because the head office engineer realized that the building was about to collapse, and since then they have undertaken to reinforce the building one side at a time, placing them in a position where they cannot unload from both sides, and therefore, delaying their operation tremendously, causing a loss of production.
 
 
 15
 I am led to believe that this work will not be finished until next summer. The cracks in the building were actually caused by the fact that some 10 ton chunks of bauxite were unloaded by the tilter, hitting the steel floor, which made the building shade to such a degree that all the cement structure started to crack. For this reason, as it was actually due to a design error, CBG's claim for this has been turned down by Mars.
 
 
 16
 I trust you realize that this will have a lot of bearing on their overall loss of production.
 
 
 17
 Stel referred to the impairment of production in his own letter to Gelinas. Since Gelinas and Stel were aware of the problems with the tippler building after talking to Mars, the district court could properly find that INA had notice adequate to apprise it of a potential claim.
 
 
 18
 The district court, relying on Philadelphia Elect. Co. v. Aetna Casualty & Sur. Co. (PECO), 335 Pa.Super. 410, 484 A.2d 768 (1984), stated that notice of a loss need not come from the insured. Thus, the court concluded that notice from Mars could constitute reasonable notice to INA. INA argues that PECO is inapplicable to the case before us. PECO involved a liability policy requiring notice "by or on behalf of the insured." The court in PECO held that notice from the co-insured constituted notice of a claim. The court stated: "we do not in any manner mean to suggest that constructive notice will be found in all future cases." 484 A.2d at 772, n. 11. The case before us involves actual notice, albeit from a party other than the insured, CBG. We conclude there is no reason to distinguish PECO from the case at hand.
 
 
 19
 The district court held that although the information from Mars constituted reasonable notice, it was not timely notice. The court found that CBG was aware of the damage to the tippler in September 1974, but that INA did not receive notice until January 1975, two months after the sixty-day period in which CBG was obligated to give notice to INA. However, the court determined that because the delay did not prejudice INA, it would not find that the late notice had breached the requirements of the policy.
 
 
 20
 INA contends that the court erred in applying the rule of Brakeman v. Potomac Ins. Co., 472 Pa. 66, 371 A.2d 193 (1977), which permits a court to consider whether the insurance company suffered prejudice when it is determining if the insured's late notice constituted a breach of the policy. Furthermore, INA maintains that even if Brakeman applies, it has shown that it was prejudiced by CBG's late notice.
 
 
 21
 In Brakeman, the Pennsylvania Supreme Court decided that an insurance company must show prejudice if it seeks to avoid its obligation on the basis of late notice. INA maintains that Brakeman should be limited to application in automobile liability cases or at least to cases involving individual consumers. While it is true that many of the provisions in the policy before us were from standard INA forms, CBG is a large company with the ability to negotiate with INA. Therefore, the first rationale for the Brakeman rule, that an insurance policy is often a contract of adhesion, does not necessarily apply in the case before us. However, the second rationale of Brakeman does apply here. A forfeiture takes place if the insurer is relieved of its obligation to pay compensation for damages within coverage of the policy simply because of late notice. Absent prejudice from late notice, the reason for the notice requirement does not exist.
 
 
 22
 The Pennsylvania Supreme Court has refused to apply the Brakeman rule in cases in which the insured brought suit beyond the statute of limitations period required by law and included in the insurance policy. See Schrieber v. Pennsylvania Lumberman's Mut. Ins. Co., 498 Pa.2d 21, 444 A.2d 647 (1982). However, we have no reason to believe that Pennsylvania will limit the Brakeman notice rule to consumer insureds. See Laughton v. Chester County Mut. Ins. Co., No. 84-5527, slip op., --- F.Supp. ---- (E.D.Pa. February 28, 1985) (Brakeman rule applies in notice cases); Jewelcor, Inc. v. St. Paul Fire and Marine Ins. Co., 499 F.Supp. 39, 40 n. 1 (M.D.Pa.1980) (Brakeman rule would apply in a case involving a business interruption loss); Del Boring Tire Serv. v. Fed. Emergency Management Agency, 496 F.Supp. 616, 619 (W.D.Pa.1980) (Brakeman rule applies in case involving flood insurance); Judge v. Celina Mut. Ins. Co., 303 Pa.Super. 221, 449 A.2d 658 (Pa.Super.Ct.1982) (Brakeman rule applies in case involving fire insurance).
 
 
 23
 It is not entirely clear from the lower court opinion whether the court actually applied the Brakeman rule. The court indicated that it did not consider the notice late when it stated that the notice given was reasonable under the circumstances. But even if the court believed that the notice was unreasonably late and applied the Brakeman rule, it could properly conclude that the late notice had not prejudiced INA. There was little evidence concerning whether earlier notice would have allowed INA to minimize or mitigate losses. INA would have had to send an investigator before they could make any suggestions. In the past, INA's investigator, Mars, had not arrived in Guinea until after repairs had commenced. For example, when Mars was in Guinea in November 1974, his chief purpose was to investigate an August 31, 1974 accident. INA had not, in regard to past claims, made suggestions about how to mitigate losses. The court was entitled to reject INA's assertions that it could have done more than CBG did to minimize the losses.
 
 
 24
 We find that the district court properly held that the notice of loss was reasonable in this case and that, even if the notice was late, INA could not avoid its obligation on the basis of the notice requirement.
 
 III. CALCULATION OF LOSS
 
 25
 INA claims that the trial court's jury instructions erroneously permitted the jury to ignore the loss formula specified in the policy and base its award on CBG's shipment cancellations. The formula included in the policy for calculating "ACTUAL LOSS SUSTAINED by the Insured" states:
 
 
 26
 Step 1. Based on actual production experience predating the loss, calculate the production reasonably anticipated to be attained (in the absence of the physical damage) during the interruption period.
 
 
 27
 Step 2. Calculate the actual production achieved during the period of interruption.
 
 
 28
 Step 3. If Step 2 yields a larger number than Step 1, there is no loss. Otherwise, subtract Step 2 from Step 1 to determine lost production in tons. The result is the "reduction in Gross Earnings." The "ACTUAL LOSS SUSTAINED" cannot exceed this tonnage.
 
 
 29
 Step 4. Determine (bearing in mind the commercially reasonable use of inventory) whether or to what extent the production loss (i.e. the result of Step 3) resulted in loss of shipments.
 
 
 30
 INA contends that the jury was instructed to consider shipping losses rather than production losses. Although the jury was not presented with the exact formula in the policy, we believe the jury instructions given were proper. INA argues that the court's emphasis on loss of shipments allowed the jury to grant damages for lost shipments that were caused by reasons other than lost production, and, that the jury, therefore, awarded damages for reasons not within the coverage of the policy. We note, however, that the court specifically instructed the jury to consider only those lost shipments resulting from lost production.
 
 
 31
 INA states that if the policy formula had been specifically applied the jury could not have possibly reached the award it did. This is only true, however, if certain terms in the formula are interpreted as INA suggests. Step one requires a calculation of "the production reasonably anticipated to be attained (in the absence of the physical damage) during the interruption period." INA maintains that the "interruption period" lasted from January 1975 to April 1975, the period during which the tippler building was completely closed down for repair. INA then reasons that there can be no award for cancellations of shipments made prior to January 1975 or for shortfalls in production prior to January 1975. We disagree. The policy does not state that the interruption period is limited to the repair period. We believe that the interruption period could be found to have started in September 1974, when the cracks were discovered and management reacted by curtailing production and canceling shipments, and lasted until April 1975, when the repairs were completed.
 
 
 32
 From January 1975 to April 1975, no bauxite was crushed. However, there was crushing in the amount of 475,510 metric tons in October 1974, 456,095 metric tons in November 1974, and 474,810 metric tons in December 1974. INA contends that CBG suffered no production losses from October to December because prior to October 1974, the most bauxite that had been crushed in a month was 448,549 metric tons. According to step one of the formula, losses are calculated by reference to "the production reasonably anticipated to be attained." Although this anticipated amount is determined by considering "actual production experience," the anticipated amount could reasonably exceed past performance. CBG submitted evidence that it had planned to crush 6.8 million metric tons from October 1974 to October 1975. To reach this goal, they would have to crush about 567,000 metric tons per month. If the jury found this to be a reasonable goal, then the production amounts from October to December 1974, while greater than any past amounts crushed, would have been less than expected and would constitute production losses. CBG claimed that it intentionally curtailed crushing from October to December 1974 in order to keep the cracks from causing a total collapse of the tippler building. CBG maintains that its expectation of crushing 6.8 million metric tons in its second production year could be found reasonable since in May 1975, the first month of crushing after the tippler was repaired, CBG crushed 675,000 metric tons. Although crushing from October to December 1974 was greater than ever before, the jury could find that CBG accumulated losses because they crushed less than they reasonably expected to.
 
 
 33
 Based on their projections as of September 2, 1974, CBG crushed 1,550,551 metric tons less than it expected from October 1974 to March 1975. The policy formula required a determination whether the "production loss ... bearing in mind the commercially reasonable use of inventory ... resulted in loss of shipments." The jury was instructed as to amounts crushed, decreases in inventory, and canceled shipments. Their finding of a loss of 935,250 metric tons is consistent with proper application of the policy formula and we do not believe that the jury instructions given prejudiced INA.
 
 
 34
 INA objects strenuously to the emphasis in the instructions on shipping losses as opposed to an inability to crush bauxite. CBG argues in response that the policy covered losses caused by damage to all of CBG's facilities including, not only the crushing facility, but the shiploading facility. While this interpretation of the policy is correct, it does little to support CBG's claim, since the shipping losses in this case resulted from damage to the crushing and not the shiploading facility. However, we believe that the lower court correctly found support for CBG's claim in Paragraph 2(h)(iii) of the policy. This paragraph provides that the insurance company is liable for losses from any "suspension, lapse or cancellation [that] results directly from the interruption of business...." INA contends that CBG should not recover for losses resulting because CBG canceled so many shipments in September. CBG admitted that they canceled more shipments than it turned out was necessary. However, the jury was entitled to find that the cancellations were reasonably made when the cracks were first discovered.
 
 
 35
 Because the policy's formula requires that actual losses be calculated by considering a reasonable use of inventory, we believe that the amount of canceled shipping was an appropriate basis for determining losses. The jury did not simply base its award on shipping losses. It was instructed to consider only those shipping losses resulting from the interruption of business. The lower court judge instructed the jury to accept as true that shipments were canceled. But it was up to the jury to decide if the interruption of business caused the cancellations.
 
 
 36
 INA claims that the district court erred by allowing the jury to award damages for losses caused not only by the repair of the tippler building, but by the redesign and reconstruction of the building. The judge told the jury that they could award damages arising out of the period required "to rebuild, replace or repair." (App. 5963a). We believe this instruction was appropriate. CBG was entitled to rebuild the crushing facility in a way which would avoid future cracking. See Anchor Toy Corp. v. American Eagle Fire Ins. Co., 4 Misc.2d 364, 155 N.Y.S.2d 600 (1956).
 
 IV. POLICY EXCLUSIONS
 
 37
 INA contends that the trial court erred in refusing to consider the policy exclusions in Paragraph 2 of the policy. The cover page to the policy refers to "all risk" insurance. Paragraph 1 states: "This policy insures against: loss resulting directly from necessary interruption of real or personal property...." Paragraph 2 states:
 
 This policy does not insure against:
 
 38
 (a) Mechanical Breakdown, unless other accident covered hereunder ensues, and then this policy shall cover the ensuing loss only;
 
 
 39
 (b) Theft, conversion or infidelity by any employee of the Insured. Actual physical damage to the Insured's property as a result of a willful act of malicious intent shall be deemed not to be an act of infidelity;
 
 
 40
 (c) Inherent vice, latent defect, wear and tear, gradual deterioration, delay, loss of market;
 
 
 41
 (d) Insurrection, rebellion, revolution, civil wars, usurp of power, or action taken by governmental authority in hindering, combatting, or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;
 
 
 42
 (e) Hostile or warlike action in time of peace or war, including action in hindering, combatting, or defending against an actual impending or expected attack;
 
 
 43
 (i) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval or air forces, or
 
 
 44
 (ii) By military, naval or air forces, or
 
 
 45
 (iii) By an agent or any such government power, authority or forces;
 
 
 46
 (f) Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;
 
 
 47
 (g) Loss by nuclear reaction or nuclear radiation, or radioactive contamination--all whether controlled or uncontrolled, and whether such loss be direct or indirect, approximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the perils insured against in this policy;
 
 
 48
 (h) increase of loss resulting from:
 
 
 49
 (i) Enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures; or
 
 
 50
 (ii) Interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of business; or
 
 
 51
 (iii) The suspension, lapse or cancellation of any lease, license, contract or order unless such suspension, lapse or cancellation results directly from the interruption of business, and then this company shall be liable for only such loss as affects the Insured's earnings during, and limited to, the period of indemnity covered under this policy;
 
 
 52
 Nor shall this company be liable for any other consequential or remote loss.
 
 
 53
 When this form is attached to a policy covering the perils of windstorm and hail, this company shall not be liable for any business interruption loss resulting from damage to or destruction of metal smokestacks by windstorm or hail, unless otherwise provided for by endorsement hereon and premium paid therefor.
 
 
 54
 (i) Any loss resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical currents artificially generated unless fire ensues and, if fire does ensue, this company shall be liable only for its proportion of loss caused by such ensuing fire.
 
 
 55
 Judge Ziegler did not permit INA to raise, at trial, the exclusions in Paragraph 2. We believe he acted properly in relying on the prior decision of District Judge Simmons in the bucket wheel case, Compagnie des Bauxites de Guinee v. Insurance Company of North America, 554 F.Supp. 1075 (W.D.Pa.1983). Judge Simmons stated:
 
 
 56
 Only two exclusions contain language limiting loss, exclusion 2(g), pertaining to loss caused by nuclear reaction and nuclear radiation, and exclusion 2(i) pertaining to loss by electrical injury. By changing the language of these particular exclusions, that is, exclusion 2(g) and 2(i), the insurance company obviously manifested its intent to eliminate the "loss" requirement from the exclusions. Thus it is clear the exclusion 2(a) does not refer to "loss or damage caused by" mechanical breakdown, but only to the mechanical breakdown or defect itself.
 
 
 57
 According to Judge Simmons, paragraph 2(a) excludes losses from the direct cost of replacing or repairing property due to a mechanical breakdown but does not exclude the losses from a business interruption resulting from a mechanical breakdown. INA disagrees with this interpretation of the policy, claiming that both parties to a business interruption contract know that property damage is not covered. It contends, therefore, that the exclusions such as 2(a) must exclude something more than property damage. But Judge Simmons noted that when the insurer meant to exclude business interruption losses from a particular type of damage it said so explicitly as in 2(g) on nuclear reaction and 2(i) on electrical injury. Judge Simmons, quoting from Dickson v. United States Fidelity and Guaranty Co., 77 Wash.2d 785, 466 P.2d 515, 518 (1970), stated that to allow the insurer to exclude business interruption losses resulting from all the types of damage listed in paragraph 2 would turn the "all risk" policy into a nearly "no risk" policy.
 
 V. PREJUDGMENT INTEREST
 
 58
 INA's claim that CBG failed to properly present proof of loss until trial and, therefore, that the court erred in awarding prejudgment interest, is without merit. Courts have held that under Pennsylvania law when the insurer denies any liability, the insured is entitled to interest from the date the loss occurred. See Eastern Associated Coal v. Aetna Cas. & Sur. Co., 475 F.Supp. 586, 595 (W.D.Pa.1979) aff'd in part and rev'd in part, 632 F.2d 1068 (3d Cir.1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981); Jones v. Protection Mut. Fire Ins. Co., 93 F.Supp. 505, 510 (E.D.Pa.1950) aff'd, 192 F.2d 1018 (3d Cir.1951); Gardner v. Freystown Mut. Ins. Co., 350 Pa. 1, 37 A.2d 535 (1944); Berkeley Inn, Inc. v. Centennial Ins. Co., 282 Pa.Super. 207, 422 A.2d 1078, 1081 (Pa.Super.Ct.1980); Samuels v. California Insurance Co., 192 Pa.Super. 484, 162 A.2d 48, 50 (Pa.Super.Ct.1960). The district court awarded interest from April 18, 1975, the date on which repairs to the tippler building were complete. INA contends that use of such an early date is in conflict with the usual rule in contract cases, which provides for interest from the date on which payment or performance was due. See Benefit Trust Life Ins. Co. v. Union Nat'l Bank, 776 F.2d 1174, 1178 (3d Cir.1985). Since CBG did not even notify INA about its claim until June 1975, it appears logical that interest should be computed from June 1975 and not April 18, 1975. Nevertheless, in cases where the insurer completely denies liability. Pennsylvania law permits the granting of interest from the date of loss rather than the date of notice. We are, therefore, convinced that the award of interest in this case was not improper.
 
 
 59
 In making the foregoing determinations we freely concede that the major issues presented by INA are close and fully justified appellate review.
 
 
 60
 For the above reasons, we will affirm the judgment of the district court.