**TRIANGLE PUBLICATIONS, INC.**

v.

**LIBERTY MUTUAL INSURANCE COMPANY.**

**Civ. A. No. 85–7075.**

United States District Court, E.D. Pennsylvania.

Jan. 4, 1989.

John M. Fitzpatrick, Robert W. Maris, Philadelphia, Pa., for Triangle Publications, Inc.

Daniel J. Ryan, K. Charles Gudenas, Philadelphia, Pa., for CNA Ins. Companies.

Marjorie E. Greenfield, Anderson & Greenfield, Philadelphia, Pa., for Liberty Mut. Ins.

## MEMORANDUM—ORDER

CLIFFORD SCOTT GREEN, District Judge.

Presently before this court are defendant's three motions for summary judgment, and responses thereto. In addition, both parties have sent additional support for their positions directly to chambers. This

court also heard oral argument on the issues raised in defendant's motions. All of this information will be considered in addressing the motions pending before me.

## BACKGROUND

In 1975, the New Jersey State Bureau of Air Pollution began inspecting the Swope Oil and Chemical Company headquarters site located in Pennsauken, New Jersey ("Swope Site"). The agency cited the Company for operating without proper permits. The Company was cited again by the agency, in 1979, for failing to take measures against the release of toxic waste.

In June of 1983, the United States Environmental Protection Agency ("EPA") informed Philadelphia Newspaper, Inc., through its counsel, that it might be a "Potentially Responsible Party" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9657 ("CERCLA"). EPA alleged that due to the procedures being used by Swope Oil and Chemical Company, from 1965 to 1979, the newspaper might be partially responsible for the toxic waste found in the surrounding water and earth. It seems that the newspaper cleaned its presses with a roller wash, and sold the used liquid to Swope Oil and Chemical Company. The Company treated the roller wash for the newspaper's reuse. The wash that was not resold was placed in an unlined lagoon at Swope Site. This roller wash waste contained toxic agents. The waste leached, seeped, and percolated into the adjacent earth and ground water. Consequently, Swope Site was designated a Superfund Site in 1983.

In October of that year, EPA and the New Jersey Department of Environmental Protection entered into a contract which provided funding for a feasibility study, and addressed the long term remediation plan for Swope Site. A draft of the feasibility study was submitted to EPA on February 8, 1984. A month later, Triangle Publications, Inc. ("Triangle") was notified, through counsel, of its potential liability under CERCLA since Triangle owned Philadelphia Newspaper Inc. during the time Swope Oil and Chemical Company was stor-

ing the roller wash waste in the unlined lagoon. In April of 1984, EPA proposed an Administrative Order on Consent which provided for the voluntary clean up of Swope Site. Triangle, along with several other potentially responsible parties, joined in the final order issued on May 14, 1984.

A few months later, Triangle was asked by its attorneys to determine whether any insurance coverage existed for the years 1965 to 1979. Triangle discovered that it had policies with Liberty Mutual Insurance Company ("Liberty Mutual") from 1965 to 1969, the CNA Insurance Company for 1969, and the Allstate Insurance Company from 1970 to 1980. After the Order on Consent was put into effect, Triangle demanded that Liberty Mutual indemnify it for the costs it incurred in defending itself in the EPA action and in, eventually, participating in the clean up of Swope Site. Liberty Mutual refused, contending that it was not responsible for any costs under the contracts.

For purposes of this motion only, the parties agree that the terms of the Liberty Mutual Standard Comprehensive General Liability ("CGL") policy, which was in effect from 1965 to 1969, will govern. Apparently, the original Triangle–Liberty Mutual policies have been lost, and copies are not available. Liberty Mutual's standard CGL provided in pertinent part:

> Coverage B—PROPERTY DAMAGE LIABILITY
>
> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such ... property damage, even if any of the allegations of the suit are groundless, false or fraudulent ...
>
> "[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Plaintiff seeks a declaration that Liberty Mutual is obligated, under these terms, to indemnify it for its Swope Site liabilities. Liberty Mutual has moved for summary judgment on three grounds: First, it asserts there was never an "occurrence" so as to trigger coverage by the Triangle–Liberty Mutual contracts. In the alternative, Liberty Mutual asserts that plaintiff has not been "damaged," within the meaning of the CGL policy, since clean up costs are equitable-in-nature. Finally, Liberty Mutual argues that it has no obligation to Triangle, even if a policy coverage was triggered, because Triangle breached the contract by failing to provide timely notice of the occurrence.

## DISCUSSION

### I.

At the outset, this court is faced with the possible conflict among the laws of Massachusetts, New Jersey, and Pennsylvania.[1] The parties assert, for different reasons, that no conflict exists regarding the meaning of "occurrence," and that Pennsylvania law applies. Defendant's concession, that no conflict exists between Massachusetts and Pennsylvania law, is based upon its contention that the courts of both states use the "first discovery" trigger-of-coverage analysis.[2] Plaintiff's concession, on the other hand, is premised upon the conclusion that the "continuous trigger" rule is applied in Pennsylvania, as well as in New Jersey.[3] Since the parties conclude that Pennsylvania law controls for totally different reasons, I find it necessary to independently determine which state's law applies in this action.

This court must apply the choice-of-law rule of the forum state since jurisdiction, in this case, is based on diversity. *See Klaxon Co. v. Stentor Electric Mfgr. Co.*, 313

U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Pennsylvania courts use a flexible choice-of-law rule. In *Griffith v. United Airlines*, 416 Pa. 1, 13–23, 203 A.2d 796, 802–06 (1964), the Pennsylvania Supreme Court adopted a combination of the "interest analysis," and the Restatement (Second) of Conflict of Laws ("Restatement II") approach in determining which state's law should be applied in a tort claim. The test in *Griffith* has been extended to contract actions. *See American Contract Bridge v. Nationwide Mutual Fire Ins. Co.*, 752 F.2d 71, 74–75 (3d Cir.1985); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1313 (3d Cir.1978). Accordingly, the test announced in *Griffith* will determine the appropriate state law to be applied in this case.

Under the "interest analysis" arm of the test, I am to examine the competing interests of the states involved, and determine which state has the most significant contacts with the controversy. The interests of Massachusetts, Liberty Mutual's domicile, are insignificant. Massachusetts' only contact with the controversy is based on the fact that Liberty Mutual is incorporated in that state. New Jersey is also only incidentally connected with the controversy. New Jersey is involved simply because Swope Oil and Chemical Company chose Pennsauken as a place for storage. Pennsylvania clearly has the most significant interest in the controversy. The contract was negotiated and entered into in Pennsylvania. Triangle's domicile, and the site of all of its property, is located in Pennsylvania. Under the basic tenets of contract law, these factors are most important when weighing the competing interests of the states. *See generally* R. Weintraub, Com-

1. Massachusetts is Liberty Mutual's domicile. New Jersey is where the ultimate damage occurred, and Pennsylvania is the site of Triangle's home office.

2. Under this analysis, an "occurrence" takes place, within the meaning of the standard CGL policy, when injuries first manifest themselves. *See Bartholomew v. Insurance Co. of N. America*, 502 F.Supp. 246, 254 (D.R.I.1980), *aff'd. sub.*

*nom. Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir.1981).

3. *See Lac D'Amiante Du Quebec Ltee. v. American Home Assurance Co.*, 613 F.Supp. 1549, 1555–61 (D.N.J.1985) (where district court predicted that the New Jersey Supreme Court would use the "continuous trigger" theory which defines "occurrence" as an event that elapses from exposure to manifestation).

mentary of the Conflict of Laws, at 348 (2d ed. 1980).

Pennsylvania is also the state most connected with the controversy under the second part of the *Griffith* test. Based on the Restatement II analysis, the principal location of the risk should "be given greater weight than any other single contact." Restatement (Second) of Conflict of Laws § 193 comment b (1971). In this case, at the time the policies were purchased, Pennsylvania was the site of all of Triangle's property. The risk that Triangle sought to shift, by way of insurance coverage, was its potential liability for injury to person or property as a result of its Pennsylvania base of operation. Therefore, I find that the correct choice-of-law is indeed the law of Pennsylvania.

## II.

■ The central issue in this declaratory judgment action is whether the Triangle–Liberty Mutual insurance contracts were triggered 1) when Swope Oil and Chemical Company exposed the property to damage by storing the waste in the lagoon; 2) during the time of storage after the initial exposure; 3) upon discovery of the ultimate environmental injury; or 4) at any interval between exposure and manifestation. Liberty Mutual asserts that the coverage is triggered only upon discovery of the injury. It contends that since the damage at Swope Site was discovered in 1975, well after the Triangle–Liberty Mutual contracts expired, none of its policies were triggered. Plaintiff's principal argument, in opposing Liberty Mutual's first summary judgment motion, is that the contract provision regarding "occurrence" is ambiguous and thus, must be construed against the insurer. The construction urged by plaintiff is that coverage must necessarily be triggered, at any point in time, from the date of exposure to the date of manifestation. I reject both arguments, and find that the plain language of the CGL contract supports only one construction: the injury-in-fact analysis.

While I agree with plaintiff that the term "occurrence," standing alone, could give rise to two conflicting reasonable interpretations, *see Little v. MGIC Indemn. Corp.*, 836 F.2d 789, 794 (3d Cir.1987), it is clear that the term does not stand alone. In fact, the term is expressly defined in the contract.

Under the contract, an "occurrence" is defined as

an accident, including injurious exposure to conditions, which results, during the policy period in bodily injury or property damage neither expected nor intended by the parties from the standpoint of the insured.

The plain meaning of the term "occurrence," as used in the CGL policy, is clear. It is (1) an accident (2) which results (3) in property damage (4) during the policy period. Stated another way, an actual injury must occur during the time the policy is in effect in order to be indemnifiable or compensable. Any other interpretation is simply not supported by the CGL policy language. *See generally American Home Products Corporation v. Liberty Mutual Insurance Company*, 565 F.Supp. 1485, 1500–03 (S.D.N.Y.1983), *affirmed as modified*, 748 F.2d 760 (2d Cir.1984) (where the district court discusses the history of the CGL policy).

Other courts have found that the term "occurrence," as defined, unambiguous under Pennsylvania law. In *Appalachian Insurance Company v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 62 (3d Cir.1982), the Third Circuit, applying Pennsylvania law, found that "[t]here can be no question but that the aspect of the occurrence which *must* take place within the policy period ... *is the 'result', that is, the time when the accident or the injurious exposure produces ... injury.*" (Citations omitted) (Emphasis supplied). A Pennsylvania trial court adopted the *Appalachian Insurance Company* test in *Metal Bank of America v. Liberty Mutual*, No. 861, slip opinion (C.C.P. Phila. County June 8, 1986), *aff'd*, 360 Pa.Super. 350, 520 A.2d 493 (1987), to determine liability under a CGL identical to the one in this case. There, the court agreed with, what it labeled to be the *Ap-*

*palachian* court's definition of "occurrence," and found it to be

> [a]n accident or a happening or event or a continuous or repeated exposure to conditions *which* unexpectedly and unintentionally *results in* personal injury, *property damage* or advertising liability *during the policy period.*

*Id.* at 6 (quoting *Appalachian Insurance Company v. Liberty Mutual Insurance Company*, 676 F.2d at 59) (emphasis supplied).[4] *See also Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.*, 677 F.Supp. 342, 347 (E.D.Pa.1987) (where Judge Newcomer found that the " 'actual damage' approach to the trigger of coverage analysis of an occurrence-type insurance policy" was recognized in Pennsylvania).

While the Pennsylvania Supreme Court has not decided this particular issue, it is well established, under Pennsylvania law, that where the language of a contract is clear and unambiguous, the court is bound to its plain meaning. *St. Paul Fire and Marine Insurance Co. v. United States Fire Insurance Co.*, 655 F.2d 521, 524 (3d Cir.1981); *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983); *Pennsylvania Manufacturers' Assoc. Insurance Co. v. Aetna Casualty and Surety Insurance Co.*, 233 A.2d 548, 551, 426 Pa. 453, 457 (1967). In such cases, a court is not free to rewrite the contract to promote desirable social policy, nor empowered to disregard the language because the plain meaning would be impracticable. "A court should read policy provisions to avoid ambiguities, and not torture the language to create them." *St. Paul Fire and Marine Insurance Co. v. United States Fire Insurance Co.*, 655 F.2d at 524.

Having concluded that the provision is unambiguous, under the express language of the CGL policy, Triangle must prove that actual damage occurred during Liberty Mutual's coverage in order to be indemnified. In reaching this conclusion, I reject Triangle's argument that an event other than an actual injury will create an "occurrence" within the meaning of the CGL policy. More importantly, for purposes of this motion, I reject Liberty Mutual's contention that the policy is triggered only upon the manifestation of an injury. When the environmental damage to Swope Site first occurred cannot be determined as a matter of law on summary judgment.

Summary judgment is inappropriate where a genuine issue of material fact exists. Fed.R.Civ.P. 56(c). Here, a dispute exists regarding the date of actual injury. Liberty Mutual argues that damage occurred, at the earliest, upon manifestation, a time after the expiration of the Triangle–Liberty Mutual policies. Triangle, on the other hand, contends that "damage did take place from discharge, escape or release of pollutants to some degree in all the years between 1965 and 1983." Plaintiff's Response to Liberty Mutual Insurance Company's First Set Of Requests For Admissions, ¶ 16. Triangle points to the fact that EPA alleged "from the moment of deposit into the lagoon [an injurious exposure] existed." Legal Memorandum of Plaintiff Triangle Publications, Inc. Opposing the Four *In Limine* Motions of Defendant Liberty Mutual Insurance Company, p. 19. Since Triangle may be able to prove that property damage did occur during a policy term, summary judgment is inappropriate. Thus, Liberty Mutual's first motion for summary judgment must be denied.

### III.

Liberty Mutual argues, in its second motion for summary judgment, that plaintiff has not been "damaged" within the meaning of the policy.[5] It contends that

---

**4.** The *Metal Bank* court also found that an "occurrence" takes place upon discovery if the date of actual damage is not discernible. *Metal Bank of America v. Liberty Mutual*, No. 861, slip opinion at 5 (C.C.P. Phila. County June 8, 1986), *aff'd*, 360 Pa.Super. 350, 520 A.2d 493 (1987).

**5.** The CGL policy states, in pertinent part, that:

> [the insurer agrees] [t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including loss of use thereof, caused by an occurrence ...

and that:

"the CERCLA action cannot be characterized as a "damage" action within the settled and generally recognized meaning of the word." Memorandum of Defendant Liberty Mutual Insurance Company in support of its Second Motion for Summary Judgment, p. 3.

Under Pennsylvania law, the term "damages" has been held to include certain equitable relief. *See Consolidated Rail Corp. v. Certain Underwriters At Lloyds of London*, No. 84–2609, slip opinion (E.D.Pa. June 3, 1986) [1986 WL 6547] (and cases cited therein), *aff'd*, 853 F.2d 917 (3d Cir.1988). Liberty Mutual may be correct that, under the law of this state, pure injunctive relief directed solely at preventing future harm is not encompassed by the word "damages." The record here, however, does not conclusively show that Triangle's expenditures were solely equitable in nature. It may have indeed experienced the type of "damages" recognized by the Pennsylvania courts. In light of this, I am unable to conclude, as a matter of law, that Triangle has not been damaged within the meaning of the CGL policy. Therefore, Liberty Mutual's second motion for summary judgment is denied.

### IV.

█ Finally, in its third motion for summary judgment, Liberty Mutual contends that it has no obligation to Triangle, under the policies, even if there was an "occurrence" resulting in damage. According to Liberty Mutual, Triangle breached the contract by its late notification of the occurrence, thus relieving Liberty Mutual of its contractual obligations. This issue cannot be decided as a matter of law.

At trial, Triangle will bear the burden of proving that notice was given "as soon as practicable."[6] Triangle has pointed to sufficient evidence of timely notification to withstand the summary judgment motion.

*See* Plaintiff's Exhibits E, H. Thus, whether Triangle breached the contract cannot be decided on summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, as defendant concedes, the "insurance company must show prejudice if it seeks to avoid its obligation on the basis of late notice." *Compagnie des Bauxites v. Insurance Company of North America*, 794 F.2d 871, 875 (3d Cir.1986) (citing *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977). It is not clear that Triangle's acceptance of EPA's Order on Consent, prior to notification, prejudiced Liberty Mutual. Arguably, the resolution Triangle obtained by way of settlement may have been better than any solution Liberty Mutual could have achieved. Absent a showing of prejudice, Liberty Mutual cannot avoid its obligations even if notification was untimely. Accordingly, Liberty Mutual's third motion for summary judgment must be denied.

### CONCLUSION

Liberty Mutual's first, second, and third motions for summary judgment are denied.

---

[the insurer agrees] to defend any suit against the insured alleging such ... destruction [of property] and seeking damages on account thereof, even if such suit is groundless, false or fraudulent ...

The word "damage" is not defined anywhere in the policy.

6. Paragraph 4 of the CGL policy states, in relevant part, that "[i]n the event of an occurrence, written notice containing particulars sufficient to identify the insured ... shall be given ... as soon as practicable."