520 A.2d 493

METAL BANK OF AMERICA, INC., Appellant,

v.

INSURANCE COMPANY OF NORTH AMERICA,
Pennsylvania Manufacturers Insurance Company
and Liberty Mutual Insurance Company

v.

FEDERAL INSURANCE COMPANY and Home
Insurance Company

v.

GREAT AMERICAN INSURANCE COMPANY and American National Fire Insurance Company, the Hartford Accident & Indemnity Company and U.S. Fire Insurance Company, Appellees.

Superior Court of Pennsylvania.

Argued Oct. 1, 1986.

Filed Jan. 30, 1987.

John Mattioni, Philadelphia, for appellant.

Robert R. Reeder, Philadelphia, for Insurance Co. of North America, appellee.

Marjorie E. Greenfield, Philadelphia, for Liberty Mut. Ins., appellee.

Melvin R. Shuster, Philadelphia, Home Ins. Co., appellee.

Before CAVANAUGH, McEWEN and BECK, JJ.

CAVANAUGH, Judge:

The appellant, Metal Bank of America, Inc., commenced a declaratory judgment action in April, 1983 against Liberty Mutual Insurance Company, Insurance Company of North America, and Pennsylvania Manufacturers Association Insurance Company. The Insurance Company of North America joined as additional defendants The Home Insurance Company and Federal Insurance Company. Subsequently, Home Insurance Company joined as additional defendants Great American Insurance Company, American National Fire Insurance Company and the Hartford Accident and Indemnity Company. Several other insurance companies were also joined as additional defendants.

In its declaratory judgment action, the appellant sought indemnification for investigation costs, attorneys fees and other expenses it incurred in defending a law suit brought in 1980 against Metal Bank, its parent corporation and two individual defendants, by the United States Environmental Protection Agency (EPA). It also sought reimbursement for all expenditures made by it in defense of the litigation and expenditures incurred arising from remedial actions taken by Metal Bank to satisfy an agreement which was reached with EPA in settlement of the litigation against it.

The appellees, Insurance Company of North America, Home Insurance Company and Liberty Mutual Insurance Company filed motions for summary judgment which were granted by the court below, DiBona, J. The appellant's motions for summary judgment were denied and it has appealed to this court.

A motion for summary judgment should be granted where the pleadings, discovery and affidavits reflect no genuine issue of material fact. *Loyal Christian Benefit Association v. Bender*, 342 Pa.Super. 614, 493 A.2d 760 (1985); Pa.R.C.P. 1035(b). A summary judgment should only be entered in those cases which are clear and free from doubt. *Weiss v. Keystone Mack Sales, Inc.*, 310 Pa.Super. 425, 456 A.2d 1009 (1983). The court must accept as true all well-pleaded facts in the plaintiff's pleadings, and give

the plaintiff the benefit of all reasonable inferences to be drawn therefrom. *Spain v. Vincente,* 315 Pa.Super. 135, 461 A.2d 833 (1983). However, a prima facie showing by the party seeking summary judgment, i.e., the production of enough evidence to demonstrate such party's entitlement to a judgment if evidence were uncontroverted at trial, shifts the burden of producing evidence to the party opposing the motion. In such circumstances summary judgment should be granted to the moving party unless the opposing party offers competent evidence admissible at trial showing that there is a genuine issue of material fact. *Community Medical Services, Inc. v. Local 2665,* 292 Pa.Super. 238, 437 A.2d 23 (1981).

In the instant case, it was established that Liberty Mutual Insurance Company had policies of insurance in effect which extended coverage to the appellant from August 1, 1968 to January 1, 1971 under a comprehensive general liability policy and from July 20, 1968 to January 1, 1971 under an excess liability policy. Home Insurance Company issued two policies to the appellant. Coverage under the first policy began on January 1, 1969 and ended on January 1, 1970. Coverage under the second policy began on September 30, 1973, and ended on January 1, 1975. The policies issued by both companies provided that notification of injuries or damages which would involve coverage under the policies had to be given as soon as practicable after the occurrence or event covered by the policy took place.[1]

The underlying event which allegedly triggered responsibility on the part of the insurance companies occurred in or about August of 1972 when the Coast Guard notified the appellant that it was responsible for an oil spill on the Delaware River caused by a rupture in an underground storage tank. In October, 1972 the appellant wrote to the

1. The appellant did not produce the insurance policy under which it attempted to impose liability on The Insurance Company of North America. However, it was established by affidavit that all comprehensive general liability policies issued during the applicable period by INA would have contained language that required notice to the company or its authorized agent as soon as practicable after the event giving rise to liability by the insurer.

Chief of Compliance, Department of Environmental Resources and denied that it was violating any rules of the Department of Environmental Resources but stated "While denying any violation as mentioned above, we do agree that industrial housekeeping at that location can be improved and we have accordingly taken the following action ..." The letter went on to describe in detail the action Metal Bank was taking concerning the prevention of discharge of pollutants. The letter concluded "Please be assured of our strong interest in preventing any conditions that might give rise to any pollution incidents in the future." On November 1, 1972 the chief of Marine Safety Division of the United States Coast Guard wrote to Metal Bank of America stating *inter alia:* "A report has been received by this office that oil in harmful quantity was allegedly discharged into the navigable waters of the United States on 3 August 1972 from your facility at Philadelphia, Pennsylvania ... Section 11(b)(5) of the Act [The Federal Water Pollution Control Act of 1956], states, in part, that the owner or operator of a facility or vessel from which oil is knowingly discharged shall be assessed a civil penalty of not more than $10,000.00 for each offense."

On May 13, 1973 the Chief of the Water Quality Branch, Delaware River Basin Commission, wrote to the appellant as follows:

On April 4, 1973 and again on May 1, 1973 we received reports that oil from the Metal Bank plant created oil pollution incidents on the Delaware River. We understand that a pile of transformers is stored on or near the river bank and that oil from these transformers may cause additional incidents.

Will you please explain how your plant recovers waste oil, where the oil is finally disposed of and what steps you have taken or plan to take to prevent oil spills and oil leaking from plant property.

During the period from 1973 to 1980 investigations were undertaken by the Federal Environmental Protection Agency and the Pennsylvania Department of Environmental Re-

sources. Various governmental agencies made demands on Metal Bank of America during these years. Metal Bank engaged in various and extensive negotiations with EPA relating to the seepage into the Delaware River. In its complaint for declaratory judgment the appellant contends that an underground tank which it owned sustained a leak prior to 1972 and ruptured in 1972 and this was the source of the oil seepage onto its property and ultimately into the Delaware River.[2] Finally, in April, 1980, EPA filed a complaint against Metal Bank in the United States District Court for the Eastern District of Pennsylvania claiming damages in excess of $2,000,000.00 caused by the discharge of hazardous waste by Metal Bank into the Delaware River from 1968 to 1973. Metal Bank defended this action by its own attorneys for two years without any notice whatsoever to the appellees.

Liberty Mutual Insurance Company was not notified of the action by the EPA against Metal Bank until February, 1982. In May, 1982 Metal Bank notified The Insurance Company of North America for the first time of the occurrence giving rise to its claim against its insurance carrier. Home Insurance Company did not know of the events giving rise to possible liability on its part until INA served Home Insurance Company with its complaint joining Home

**2.** The appellant's complaint for declaratory judgment alleged, *inter alia:*

5. In or around 1968 until 1972, Metal Bank used the Cottman Avenue site to process recycled transformers and to drain and temporarily store oil from transformers. Metal Bank employees would drain the oil by allowing it to flow onto a concrete platform which was slanted toward the center. At the center was a hole which allowed the oil to flow into an underground holding tank. The oil tank developed a leak prior to 1972 and in 1972 the tank ruptured allowing the oil to seep through a previously filled area and eventually into the Delaware River.

6. Plaintiff, Metal Bank, in 1972 discontinued its practice of collecting oil from transformers and storing it in the underground tank and it has cleaned the tank and filled it with cement material.

7. Metal Bank has expended as of October 28, 1982, more than $340,000.00 in costs for clean up of oil in 1973, equipment, contractors, hired labor, administration, consultants and legal services.

Insurance Company as an additional defendant in the action.

In July, 1982, the appellant wrote to INA sending copies of the pleadings involved in the suit against it, among other documents. The letter stated *inter alia:*

We have proceeded with extensive discovery in this matter and have conducted substantial investigations into the underlying facts and circumstances of the case.

The claim arose out of a sudden and unexpected pollution incident that occurred in 1972. When that spill incident occurred, certain remedial actions were taken by Metal Bank under the directions of U.S. Coast Guard personnel. It was believed at the time that the actions taken had remedied the situation.

Unfortunately, it was later learned that a pool of PCB's had accumulated underground at the site in question. This pool lay in relative repose until 1972 and, after that "clean up" in repose until 1977. At that time another pollution incident is alleged to have occurred. The present litigation relates back to the 1969–72 problems.

The government's primary assertion of liability at this time is based upon a claim or contention that unless the remedial action is completed there remains the potential for a large sudden discharge or release of polluting PCB's into the environment.

The original position by the government, if fully implemented would have cost $15 to $30,000,000.00. While I do not have accurate figures available to me, I believe it is estimated that the actual "settlement" being negotiated will probably not exceed $500,000.00 in cost. The actions are underway at the site. Work has not been completed. The settlement Stipulation has not been signed by the government. The U.S. Magistrate handling the case, Edwin E. Naythons, has urged the government to approve the Stipulation.

We recognize that the notice to you of this claim is late. However, we believe that there is no prejudice inasmuch as our files are open to you for your review, the results

appear to be reasonably favorable in terms of the liability and exposure in the case, and coverage under the policy reasonably certain. Furthermore, legal fees and expenses have been kept in line largely as a result of our agreement to represent Metal Bank at a reduced hourly rate. We will provide you copies of all bills rendered to Metal Bank which are detailed and describe activities reasonably precisely upon your request.

At this time, in behalf of the Metal Bank of America, Inc., we request that you accept responsibility under the applicable policy or policies of insurance and agree to pay all expenses for liability for remedial action, costs, counsel fees and expenses.

The underlying event which formed the basis of the appellees' liability as insurance carriers occurred no later than 1973. Certainly, by then Metal Bank was fully aware that the state and federal governments felt that it was responsible for polluting the Delaware River. In 1972 the appellant denied liability for any unlawful contamination of the environment but outlined the steps it was taking to correct the situation. Extensive and unsuccessful negotiations took place between the EPA and Metal Bank prior to the EPA suit against Metal Bank in 1980. Even then, the appellees were not notified of the legal action against Metal Bank. It was not until some two years after the litigation commenced in the United States District Court, that Metal Bank notified its insurance carriers. The appellant does not contend that it gave timely notice to the appellees concerning the underlying occurrence of the pollution or of the suit against it by EPA in 1980. As noted above, it recognized that its notice was late. However, it contends that the court erred in determining as a matter of law that the appellees were prejudiced as a result of the untimely notice.

At one time the provisions in an insurance policy that the insurer must be notified as soon as practicable after the occurrence of the event covered by the policy were strictly enforced and late notice to the insurer would release it from its contractual obligations even where the insurance compa-

ny was not prejudiced. *Meierdierck v. Miller*, 394 Pa. 484, 147 A.2d 406 (1959). See also *August v. Stasak*, 492 Pa. 550, 424 A.2d 1328 (1981). The rule was changed in the often cited case of *Brakeman v. Potomac Insurance Company*, 472 Pa. 66, 371 A.2d 193 (1977) which held that late notice to an insurance company releases the insurer from its obligations under the policy only where it has been prejudiced by the untimely notice.[3]

We must view *Brakeman, supra* in the framework of its factual situation. In that case, a 17 year old youth, David Baker, was operating his father's automobile and was involved in an accident with a motorcyclist on March 3, 1970. Baker did not notify his insurance carrier until October 6, 1970 after he was told by the attorney for the motorcyclist that suit was being instituted. The Supreme Court directed a new trial to determine if the insurance company had been prejudiced by the untimely notice. The Court stated at 472 Pa. 74, 75, 371 A.2d 197:

> The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim. *Farmers National Bank v. Employers Liability Assurance Corp., supra* [414 Pa. 91, 199 A.2d 272 (1964)]; *Hachmeister, Inc. v. Employers Mutual Liability Insurance Co.*, 403 Pa. 430, 169 A.2d 769 (1961); *Jeannette Glass Co. v. Indemnity Insurance Co. of North America, supra* [370 Pa. 409, 88 A.2d 407 (1952)]; *Bartels Brewing Co. v. Employers' Indemnity Co.*, 251 Pa. 63, 95 A. 919 (1915); 8 J. Appleman, Insurance Law

**3.** Our court refused to extend the rationale of *Brakeman supra* to the situation where the policy required proof of loss within 60 days of the loss and commencement of suit on the policy within 1 year after the loss, where neither of the conditions were met by the insured. See *Petraglia v. American Motorist Insurance Company*, 284 Pa.Super. 1, 424 A.2d 1360 (1981) which affirmed the grant of summary judgment in favor of the insurer where the policy requirements were not met even in the absence of a showing of prejudice to the insurer.

and Practice § 4732 (1962). Such a requirement protects the insurance company from fraudulent claims, as well as invalid claims made in good faith, by allowing the insurance company to gain early control of the proceedings. Since the insurance company has the advantage of a trained legal and investigatory staff, which is unavailable to the average insured, the notice requirement normally operates to benefit the insured as well as the insurance company.

In *Brakeman*, a 17 year old youth did not notify his insurance carrier for some 7 months after the accident but did so immediately after being told that suit against him was being commenced. In the instant case, we have an insured which for almost 10 years participated in negotiations with the federal and state governments over an alleged oil spill. At the termination of complex negotiations it was finally sued in 1980 by the EPA for damages in excess of $2,000,000.00. During the legal proceedings it was represented by its own counsel who defended the appellant in the legal action. It was not until ten years after the original oil spill and two years after protracted litigation commenced that the insured even advised the insurers that it was having any problems. We are dealing with a sophisticated insured, advised by counsel for many years, which had done nothing to alert its insurance carriers that they may be exposed to substantial liability caused by the polluting of public waters by the insured.

■ The instant case does not turn, however, on the sophistication, or lack thereof, on the part of the insured as to whether proper notice was given to the insurer. The test is whether untimely notice, as in this case, has prejudiced the insurers. We agree that the court below properly determined as a matter of law that the insurers were prejudiced. The insurers did not have an opportunity to investigate the facts or participate in the defense of the action against Metal Bank. In the letter of May 25, 1982 counsel for Metal Bank notified INA that Metal Bank had

been sued two years earlier by the Environmental Protection Agency. Counsel stated:

> The Complaint states a claim for an amount in excess of Two Million Dollars allegedly in payment for restitution and reimbursement of costs incurred by plaintiff, and costs and expenditures which the insured may be legally obligated to pay to remedy damages caused to government property from the accidental discharge of a hazardous waste from the insured's property (located at Cottman Avenue and Milner Street) to the Delaware River, during the insured years 1968 through to 1973.
>
> Through the determined and continued efforts of its attorneys, your insured has been able to reduce the liability sum to a fraction of the originally stated claim.

The letter indicates that a settlement was already a fait accompli, and the insurers, who were being called upon to provide funds for the settlement had no opportunity to control the proceedings or in any way protect themselves. As noted in *Brakeman, supra,* the reason for timely notice to the insurer is to enable it to gain early control of the proceedings and to give it an opportunity to investigate and acquire information about the case. All of this was denied to the insurers in 1982, as the facts were stale and the litigation had been in progress for some two years.[4] Litigation involving EPA and Metal Bank was very complicated and involved many defendants. Metal Bank of America as a third party plaintiff sought to join Monsanto Corporation, Consolidated Edison Company of New York and Public Service Electric & Gas Company of New Jersey in 1981 as third party defendants. The appellees did not know of this

---

4. With respect to prejudice to the insurer the court below very appropriately noted:

> It is clear that Metal Bank's late notice to the insurance carrier not only prejudiced the insurance carrier by depriving it of the opportunity to investigate the underlying action, it has also severely prejudiced the insurance carrier's ability to defend the claim brought by the EPA and to defend the present claim being brought for indemnification and expenses. It also cannot be disputed that evidence has been dissipated and disappeared and that the passage of time has resulted in the unavailability of witnesses and the fading of memories.

and did not participate in the decision, which may have had great significance in the litigation. Nor did appellees have a voice in deciding to join others as third party defendants. In any event, the insurers did not "gain early control of the proceedings," as required by *Brakeman, supra.* In fact, the appellees were unaware of the proceedings until two years after they commenced.

In *Gerrard Realty Corp. v. American State Insurance Company,* 89 Wis.2d 130, 277 N.W.2d 863 (1979) a real estate broker had an "Errors and Omissions Policy" requiring notice to its insured "as soon as practicable" after the occurrence of an insurable event. The broker was sued for fraud, and 22 months after commencement of the action resulting in judgment against it, the real estate broker sued its insurer to recoup the amount of the judgment against it and legal fees. The lower court entered summary judgment in favor of the insurer and the Supreme Court of Wisconsin affirmed. The court stated at 89 Wis.2d 145, 277 N.W.2d 871:

> As a result of the appellant's belated notice, the respondent was denied an opportunity to investigate, defend or settle the Millers' claim. Thus, we agree with the trial court that as a matter of law the respondent was prejudiced by not receiving notice of the Millers' action until after the completion of the trial against the Goldsmiths, Rogness and the appellant and thus coverage was properly denied.

In our case, the appellant alone conducted extensive investigations, retained counsel, defended the litigation and attempted to work out a settlement agreement. These were matters in which the appellees should have participated, if they are going to be called upon to pay the very substantial costs of settlement and counsel fees.

The law of Maryland is similar to Pennsylvania and requires proof not only that an insured failed to provide the requisite notice to the insurance company, but that the insurer suffered actual prejudice by the insured's failure to comply with the policy requirements. In *Washington v.*

*Federal Kemper Insurance Company,* 60 Md.App. 288, 482 A.2d 503 (1984) an insured brought a declaratory judgment proceeding against an insurance company where the insured had been sued and defended with its own counsel. It was not until after a verdict was entered against the insured, that the insurance company was notified of the action. The lower court entered judgment for the insurer in the declaratory judgment proceedings brought by the insured and the appellate court affirmed on the basis that the company had been prejudiced by being deprived of its opportunity to defend the litigation. In the instant case not only were the insurers denied the opportunity to defend claims against the appellant, but the passage of time over so many years could result only in dimming memories and the shifting of relationships between individuals and Metal Bank. At least two supervisory personnel of Metal Bank at the Cottman office died during the intervening years between 1972 and 1982. Even the President of Metal Bank testified that he could not remember many events pertaining to the case because of the passage of time.[5] A former

---

**5.** Mr. Levin, President of Metal Bank, testified concerning the stored transformers which were intimately involved in the pollution as follows:

> Q. Do you know any of the people who were responsible, not do you know any of the people who did the actual or physical removal of the inner core of the transformer from the outer case?
> A. It may be of record. I don't know.
> Q. That is your response, you don't know any of the people?
> A. I don't know. At this point I don't remember. Your are asking me to remember something that took place 16 years ago and I don't remember.
> Q. Did you ever observe—did you ever go onto Metal Bank's Cottman Avenue site?
> A. Yes.
> Q. How often did you go onto the site?
> A. I don't know how often I went there.
> Q. Could you give me a guess, five times?
> A. Ma'am, I was there 31 years....
> Q. What would be the occasions on which you went to the Cottman Avenue site?
> A. I don't know what occasion. I was there 31 years and certainly I was at that property.

\*   \*   \*   \*   \*   \*

plant manager of Metal Bank could not be found and Metal Bank could furnish no information as to his whereabouts other than its belief that he was living somewhere in France.

As noted above, the insurers were not given an opportunity to make their own investigation of the many problems and this was prejudicial. The facts of this case are similar to those in *Colonial Gas Energy System v. Unigard Mutual Insurance Co.*, 441 F.Supp. 765 (N.D.Cal.1977). In *Colonial Gas, supra,* the insured, was a lessee of a liquid natural gas tank, and became aware of a possible problem with the tank. It promptly gave notice to the owner and emptied the tank. Following an inspection and tests, repairs were made. The tank was then refilled and restored to operation. The insured then gave notice to its insurer of a possible claim. As in this case, the insured conceded the notice was late. The court found a breach of the obligation to give notice "as soon as practicable" and that as a result of the late notice the insurer suffered substantial prejudice. The court stated at 441 F.Supp. 769–70:

Having made its own investigation, plaintiff precluded defendant from making any investigation into the matters which are material to the dispute, such as whether the leak was localized at a particular pipe and whether there was significant incidence of rust or corrosion or, as plaintiff claims, only defective welding.

Q. Now, I take it that prior to that date [August 3, 1972], you personally knew of no spill into the river originating from that site, is that correct?
A. That's right.
Q. Now, do you know as well that no one else from Metal Bank knew of such a spill?
A. I can't speak for anyone else at Metal Bank.
Q. Did you ever make an inquiry among other Metal Bank employees to find out if they had any knowledge of such a spill?
A. I don't remember if I discussed it with them or not.
Q. You don't know whether you did?
A. I don't remember.
Q. Do you know whether anyone else made such an inquiry?
A. I don't know what anyone else did.

We are not persuaded by the appellant's argument that the insurers were not prejudiced by the untimely notice. The appellant argues that 1977 was "the earliest point in time that the insured was required to provide notice." Even assuming that the appellant was not required to give notice of the events on which it based its claim until 1977, the appellees were nevertheless prejudiced by delay of five years in receiving notice. During these five years the insurers were precluded from the extensive investigations, negotiations and litigation which occurred, and the appellees were given no opportunity to control the situation or even participate.

Having determined that the court below properly decided that the appellees were prejudiced by the untimely notice given them, we need not rule on the second issue raised by the appellant which it states as follows:

Does the record, viewed in the light most favorable to the Plaintiff, contain any evidence that there was property damage and, therefore, an "occurrence" during the applicable periods of insurance coverage to create at a minimum a genuine issue of fact precluding summary judgment in favor of the insurers?

The court below determined that an insurable occurrence did not take place during the time in which the various policies were in force. However, we do not reach this issue as the insurers had no obligation under the policies because of the prejudice they suffered.

The appellant states the final issue as follows:

Whether Liberty Mutual and Insurance Company of North America, by their failure to defend the insured against the underlying complaint which on its face stated a cause of action potentially within the scope of the policies *without first obtaining a judicial determination that the underlying claim was not covered, are estopped from denying coverage?* (Emphasis added)

The appellant states that this question was not answered by the court below. The reason for this is that the issue of estoppel was not raised below. The appellant in its memo-

randum of law in opposition to Liberty Mutual Insurance Company's motion for summary judgment argued that:

By its failure to defend the insured on the underlying action, Liberty Mutual breached its obligation under the insurance contract and is therefore, liable to indemnify the insured for costs incurred in the remedial action and to reimburse it for all cost and expenses incurred in defending the action.

■ In Metal Bank's reply memorandum to Liberty Mutual's supplemental memorandum of law, it was argued that Liberty Mutual breached its duty to defend. In Metal Bank's memorandum of law in opposition to the motions for summary judgment by Home Insurance Company and The Insurance Company of North America it does not raise the issue of estoppel. On appeal, Metal Bank raises for the first time the issue that Liberty Mutual and Insurance Company of North America are estopped from denying coverage *because they did not obtain a judicial determination that the underlying claim was not covered by the policies.*[6] In the court below the appellant did not raise the

---

**6.** In its lengthy memorandum of law in opposition to Liberty Mutual Insurance Company's motion for summary judgment, Metal Bank stated at page 47:

> Ordinarily the insurer which breaches its duty to defend the action is estopped from denying coverage, and is likewise obligated to indemnify the insured for the liability subsequently incurred either by way of judgment or settlement. *Ripepi v. American Insurance Companies, supra,* [349 F.2d 300 (3rd Cir.1965) ], at 303; *Pacific Indemnity Co. v. Linn, supra,* [590 F.Supp. 643 (E.D.1984) ], at 651, n. 8; *Capital Indemnity Corp. v. St. Paul Fire & Marine Ins. Co.,* 357 F.Supp. 399 (W.D.Wis.1972); *Arcas [Arcos] v. American Mutual Liability Ins. Co.,* 350 F.Supp. 380 (E.D.Pa.1972), *aff'd* 485 F.2d 678 (3d Cir.1973).

Appellant also states the same argument in its appellate brief, pages 97–98 at the conclusion of part III of its argument which is captioned as follows:

> III. BY THEIR FAILURE TO DEFEND THE INSURED ON THE UNDERLYING ACTION, INA AND LIBERTY MUTUAL BREACHED THEIR OBLIGATION UNDER THE INSURANCE CONTRACT AND ARE THEREFORE LIABLE TO INDEMNIFY THE INSURED FOR COSTS INCURRED IN THE REMEDIAL ACTION AND TO REIMBURSE IT FOR ALL COSTS AND EXPENSES INCURRED IN DEFENDING THE ACTION.

issue that the insurers should have obtained a judicial determination that they had no obligations under the policy. Issues not raised in the trial or hearing court are not properly preserved for appellate review and will not be considered. *Kovach v. General Telephone Co. of Pennsylvania*, 340 Pa.Super. 144, 489 A.2d 883 (1985); *Cherry v. Willer*, 317 Pa.Super. 58, 463 A.2d 1082 (1983); *Durkin v. Equine Clinics, Inc.*, 313 Pa.Super. 75, 459 A.2d 417 (1983); *O'Malley v. Peerless Petroleum, Inc.*, 283 Pa.Super. 272, 423 A.2d 1251 (1980); Pa.R.A.P. 302(a). The issue that the appellees are estopped from denying coverage for failing to obtain a judicial determination that the underlying claim was not covered, not having been properly issued below is waived.

Orders affirmed.

This argument does not go to the issue of estoppel raised in the third statement of questions involved.