**HARRISBURG AREA COMMUNITY COLLEGE, Plaintiff,**

v.

**PACIFIC EMPLOYERS INSURANCE COMPANY, Defendant.**

Civ. A. No. 87–0165.

United States District Court, M.D. Pennsylvania.

March 25, 1988.

---

Harvey Freedenberg, Dana Stevens Scaduto, McNees, Wallace and Nurick, Harrisburg, Pa., for plaintiff.

Edward E. Knauss, IV, Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for defendant.

MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

Each party has requested summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff, Harrisburg Area Community College (HACC), sued defendant, Pacific Employers Insurance Company (PEIC), for refusing to reimburse HACC for money it had to repay the federal government. HACC had erroneously received funds under a federal grant program which were used to cover the cost of providing courses for student prisoners at a state prison. At the times pertinent to this action plaintiff had in effect with the defendant insurer an errors and omissions policy purportedly covering the loss. Defendant contends that plaintiff's failure to comply with certain conditions precedent in the policy absolves it from liability. Defendant also contends that plaintiff suffered no loss within the meaning of the policy. There are no factual disputes and disposition of the motions turns on the applicable law. Accordingly, this case is suitable for disposition by summary judgment. We will examine the motions under the well established standard. *See Peters Township School District v. Hartford Accident and Indemnity Co.,* 833 F.2d 32 (3d Cir.1987).

### II. *Background.*

On August 31, 1981, HACC signed a Program Participation Agreement with the United States Department of Education to administer the Pell Grant Program. The Agreement required HACC to comply with the program regulations set forth at 34 C.F.R. § 690 *et seq.* During the 1980–1984 award years, HACC ran an educational program at the State Correctional Institution at Camp Hill, Pennsylvania, and used Pell Grants to finance the expenses of the student prisoners. In computing the amount of each student's Pell Grant, HACC used a formula which included $1,100 for room and board costs. The inclusion of this item for incarcerated students was erroneous, and could have been used only if the prisoner was paying more than fifty percent of

his room and board.[1] Each student's account at HACC was credited in varying amounts from funds supplied by the government to HACC from the Pell Grant program. No money was ever given directly to a prisoner.

The government discovered the erroneous calculations in a routine audit in June of 1984 and so notified HACC on July 12, 1984. The amount of overpayments for the four program years at issue totalled $92,-772.00. There is no evidence, and defendant does not contend, that the miscalculations were anything but an honest mistake on the part of HACC. The College pursued fruitless administrative appeals through 1984 and 1985, culminating in a final letter of denial from the government, dated January 6, 1986. By that time, HACC had already satisfied its obligation to the government by agreeing to take less in Pell Grant funds over a period of time. On or about March 13, 1986, HACC finally notified defendant of the situation and sought coverage under the policy. PEIC has resisted payment and has presented the following defenses.

III. *Discussion.*

A. *Pennsylvania Law Requires the Insurance Company to Show Prejudice Before Denying Coverage Even When Notice Is Given After a Claim Has Been Paid by the Insured.*

PEIC argues that it has no duty to indemnify under the contract because plaintiff failed to comply with conditions 1, 2 and 4 of the "Conditions—Claims" portion of the policy. Condition 1, the notice provision, in pertinent part, provides that "[a]s a condition precedent to the right of protection afforded by this insurance, the Insured shall, as soon as practicable, give to the Company written notice...." Condition 2, the consent clause, provides, in pertinent part, that the "Insured shall not, except at personal cost, make any payment, admit

any liability, settle any claims, assume any obligation, or incur any expenses without the written consent of the Company." Condition 4, the no-action clause, provides, in pertinent part, that "[n]o action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all terms of this policy...." Defendant contends none of these conditions were complied with because HACC negotiated with the federal government on its own, concluded the matter for which it now seeks coverage from PEIC, and did not timely notify the company of the controversy.

In making this argument, defendant recognizes that in Pennsylvania late notice alone is not sufficient to void coverage. Rather, under *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977), an insurance company, defending against liability on the basis of late notice from the insured, must show it was prejudiced. Defendant seeks to avoid the *Brakeman* rule in this case on two grounds. First, *Brakeman* dealt solely with the notice provision of an insurance contract while here defendant argues that the consent provision has been violated as well. Second, relying upon *Metal Bank of America, Inc. v. Insurance Company of North America*, 360 Pa.Super. 350, 520 A.2d 493 (1987), defendant contends that it has been prejudiced as a matter of law by HACC's handling and payment of the government's claim before giving notice to defendant, thereby precluding PEIC from exercising its right under the contract to control the investigation and settlement of a claim it has been called upon to pay. Defendant cites cases from other jurisdictions to support its argument. *See, e.g., Lusalon, Inc. v. Hartford Accident and Indemnity Co.*, 23 Mass.App. 903, 498 N.E.2d 1373 (1986), *aff'd on other grounds*, 400 Mass. 767, 773 n. 9, 511 N.E. 2d 595, 599 n. 9 (1987). Plaintiff counters that *Metal Bank*, in light of *Brakeman*, must have been based upon some

---

**1.** Defendant's account differs from plaintiff's in that defendant asserts that HACC also used an erroneous $400 figure for books when $150 should have been part of the calculation. Since

the parties agree on the total amount of overpayments, we do not deem this difference material.

prejudice to the company unarticulated in the opinion and that, to the extent it can be read to permit an insurance company to avoid liability without showing actual prejudice, it is contrary to *Brakeman* which we must follow in this diversity action.[2]

*Metal Bank,* as plaintiff notes, is not clear-cut, but it is factually distinguishable from the instant case and is therefore not persuasive authority for the defendant. As the Pennsylvania Superior Court's opinion illustrates, *Metal Bank* was a complex case on liability and damages. In *Metal Bank,* the insured brought a declaratory judgment action attempting to obtain coverage from various insurance companies after it had defended an environmental pollution action brought against it by the federal government. The 1980 government suit had its origin in a 1972 environmental discharge. There were various federal investigations and contacts with the insured during the subsequent years dealing with this and other alleged discharges into the Delaware River. Two insurers did not receive notice of the action until some two years after its commencement and another not until it was joined as an additional defendant in the declaratory judgment action brought by Metal Bank in 1983.

Affirming the lower court's decision in favor of the insurance companies based upon prejudice as a matter of law from the late notice, the superior court noted that:

> In the instant case, we have an insured which for almost 10 years participated in negotiations with the federal and state governments over an alleged oil spill. At the termination of complex negotiations it was finally sued in 1980 by the EPA for damages in excess of $2,000,000.00. During the legal proceedings it was represented by its own counsel who defended the appellant in the legal action. It was not until ten years after the original oil spill and two years after protracted litigation commenced that the insured even advised the insurers that it was

having any problems. We are dealing with a sophisticated insured, advised by counsel for many years, which had done nothing to alert its insurance carriers that they may be exposed to substantial liability caused by the polluting of public waters by the insured.

*Id.* 360 Pa.Super. at 359, 520 A.2d at 498. The court also commented upon a letter sent by Metal Bank to one of its insurers:

> The letter indicates that a settlement was already a fait accompli, and the insurers, who were being called upon to provide funds for the settlement had no opportunity to control the proceedings or in any way protect themselves. As noted in *Brakeman, supra,* the reason for timely notice to the insurer is to enable it to gain early control of the proceedings and to give it an opportunity to investigate and acquire information about the case. All of this was denied to the insurers in 1982, as the facts were stale and the litigation had been in progress for some two years. Litigation involving EPA and Metal Bank was very complicated and involved many defendants.

*Id.* at 360, 520 A.2d at 498 (footnote omitted).

The court then proceeded to discuss cases in which prejudice to the insurer was found as a matter of law when notice was given after judgment or verdict had been entered against the insured. Defendant's interpretation of *Metal Bank* is therefore correct. At least one other court has so interpreted the case. *See Solvents Recovery Service v. Midland Insurance Co.,* 218 N.J.Super. 49, 526 A.2d 1112 (1987) (*Metal Bank* found prejudice as a matter of law).

It is also obvious, however, that the superior court concluded that the insurance companies had shown actual prejudice from the late notice. Thus, the court noted that:

> Metal Bank of America as a third party plaintiff sought to join Monsanto Corporation, Consolidated Edison Company of

2. In a diversity case we must look to authoritative pronouncements of a state's highest court. Decisions of intermediate appellate courts, while they are indicative of how the state's highest court might rule on an issue, are not conclusive. *See McGowan v. University of Scranton,* 759 F.2d 287 (3d Cir.1985).

New York and Public Service Electric & Gas Company of New Jersey in 1981 as third party defendants. The appellees did not know of this and did not participate in the decision, which may have had great significance in the litigation. Nor did appellees have a voice in deciding to join others as third party defendants. *Id.* 360 Pa.Super. at 360–61, 520 A.2d at 498–99.

It also found significant that:

the passage of time over so many years could result only in dimming memories and the shifting of relationships between individuals and Metal Bank. At least two supervisory personnel of Metal Bank at the Cottman office died during the intervening years between 1972 and 1982. Even the President of Metal Bank testified that he could not remember many events pertaining to the case because of the passage of time. A former plant manager of Metal Bank could not be found and Metal Bank could furnish no information as to his whereabouts other than its belief that he was living somewhere in France.

*Id.* at 362–63, 520 A.2d at 499–500 (footnote omitted).

The court then cited *Colonial Gas Energy System v. Unigard Mutual Insurance Co.*, 441 F.Supp. 765 (N.D.Cal.1977), which, as pointed out by plaintiff, found for the insurance company only after concluding that actual prejudice had occurred.

The existence of prejudice in fact, along with the complex nature of the *Metal Bank* litigation, distinguishes that case from the instant one. In protracted litigation where negotiating skill would be of crucial importance, especially where damages are unliquidated, the insurer has a valid claim of prejudice when notice comes after the insured has informally settled the matter. The insurance company would justifiably resist paying a settlement in those circum-

stances when it was deprived of counsel of its own choosing to oversee the matter and to negotiate, if possible, an acceptable resolution of the controversy. In the instant case, on the other hand, liability of the College is clear and the calculation of damages merely an arithmetical exercise. *Metal Bank* therefore does not control the disposition of this case. But the question remains concerning the extent of *Brakeman's* applicability.

*Brakeman* held that "where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." *Brakeman, supra,* 472 Pa. at 76–77, 371 A.2d at 198. This holding applies to condition 1 of the instant policy since its notice provision is substantively similar to the one in *Brakeman,* both requiring notice to the company "as soon as practicable." Defendant argues that *Brakeman* does not apply to condition 2 since the insurer in that case relied solely upon the notice provision to deny coverage. Defendant argues that condition 2, the consent provision, serves a different purpose from condition 1. In defendant's view, condition 2 is directed at the "assistance and cooperation" of the insured, not the "cooperation" of the company as condition 1 is. Relying upon *Metal Bank,* PEIC then argues prejudice as a matter of law in HACC's conduct depriving it of the right to control the handling and settlement of the claim.

We disagree. The consent provision prevents collusion and also serves to give the insurer complete control and direction of the defense or compromise of the claim. Couch, Cyclopedia of Insurance Law, § 51.131 (2d Ed. 1982).[3] The condition 1

3. Defendant cites Couch on page 15 of its brief in support of its own motion for summary judgment to support its contention that the "overriding" purpose of a consent condition is to prevent collusion and give the company control of the litigation. Couch, however, does not use the adjective "overriding" and we disagree with

defendant as to the overriding purpose of the consent condition. The overriding purpose, like the ultimate purpose of the notice provision, is to prevent prejudice to the insurance company. *See Brakeman, supra,* 472 Pa. at 75, 371 A.2d at 197 ("the function of a notice requirement is to

notice requirement serves the same purposes. As stated by the Pennsylvania Supreme Court:

> The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim. [citations omitted]. Such a requirement protects the insurance company from fraudulent claims, as well as invalid claims made in good faith, by allowing the insurance company to gain early control of the proceedings.

472 Pa. at 74, 371 A.2d at 197 (brackets added).

Accordingly, since the purposes of both conditions are the same, it is appropriate to apply *Brakeman* to defendant's reliance upon condition 2. A similar situation arose in *Solvents Recovery, supra.* There, Home Indemnity Company (Home) did not receive notice of one environmental suit against an insured until trial had commenced and of another suit until after the insured had entered into a consent decree. Home resisted paying under its policy, in part, relying upon paragraph 4(c) of the policy, which like condition 2 here, prohibited the insured, except at its own cost, from settling any claims or assuming any obligations. The New Jersey Superior Court stated:

> We are not persuaded that where the insured has acted in good faith the consequences of a violation of the condition that the insured cooperate with the company and afford the company the right to control both the litigation and the settlement of claims should weigh any more heavily in favor of forfeiture of cover-

age, absent a showing of appreciable prejudice, than violations of conditions of subparagraphs 4(a) and 4(b) which require timely notification of the happening of the occurrence and receipt of a claim or suit. Insurance contracts are not truly consensual arrangements; they are available only on a take-it-or-leave-it basis. *Cooper* [*v. Government Employees Ins. Co.*, 51 N.J. 86, 94, 237 A.2d 870 (1968)]. We are satisfied that the policy enunciated by our Supreme Court in *Cooper*, of requiring the carrier to bear the burden of persuasion of a likelihood of appreciable prejudice is the standard that should be applied to a violation of subparagraph 4(c) as well as 4(a) and (b).

526 A.2d at 1115 (brackets added).

The instant case is similar. PEIC is not contesting plaintiff's good faith and the additional requirement here of written consent is not material. If anything, it favors plaintiff since it contemplates that the insured could settle a claim while in the *Solvents Recovery* case there was apparently an absolute prohibition on such conduct.

Accordingly, we conclude that *Brakeman* applies here and requires defendant to show that it was prejudiced by plaintiff's violations of conditions 1 and 2 of the policy before coverage can be denied.[4]

Defendant has asserted four grounds of potential prejudice to it. First, some of the prisoners may have been paying room and board, in which event plaintiff's liability to the federal government would then have been less. Delay in notice prevented defendant from investigating this matter. Second, there was no investigation to determine if the prisoners could repay the College. Third, HACC did not exhaust all of its administrative remedies in appealing the government's disallowance of the award. Fourth, defendant was denied the opportu-

---

protect an insurance company's interests from being prejudiced").

**4.** As noted, defendant also relied upon a violation of condition 4 of the policy. But that condition, for its pertinence to the case at bar, merely incorporates violations of conditions 1 and 2. Since those conditions would not bar recovery in the absence of prejudice to defend-

ant, neither would condition 4. *See Brakeman, supra; Cooper v. Government Employees Ins. Co.*, 51 N.J. 86, 237 A.2d 870 (1968), in which both courts noted the existence of similar conditions in the policies at issue in those cases. The Pennsylvania Supreme Court cited *Cooper* in establishing the *Brakeman* rule.

nity to negotiate the repayment of a lesser amount.

We consider the first ground a serious challenge to plaintiff's recovery in this action. Defendant refers us to the deposition it took of Arthur James, a counselor on financial aid eligibility at HACC, discussing the circumstances under which it would have been proper to include the $1,100 figure in calculating the Pell Grant award for each student prisoner.

Q And under Section 56 if a prisoner pays more than one half of his or her room and board at the prison, then you can include the $1100 home maintenance?

A Yes.

Q Was that your understanding of the situation having been involved with the problem that arose?

A At the time?

Q No, after the question arose?

A Yes.

Q That's how it has been explained to you by the federal administrators?

A Well, the federal administrators assumed that the prisoners had no cost of attendance or—I'm sorry, had no cost for room and board.

Q Do you know, in fact, if they did have any?

A I don't if in fact, but we also assumed that they did not.

Q Do you know of any situations where incarcerated individuals pay for their room and board at the prison?

A If they are released—if they're still serving their sentence and they're released and living somewhere off-site, yes, they are.

Q The cost of their living off-site is considered a cost of their room and board?

A Yes. .

Q Is that your understanding?

A Yes.

Q Do you know—did you investigate whether or not any of the prisoners involved at H.A.C.C. for the four years were in that situation?

A No.

Q Did the Federal Government do that?

A No.

Q Why didn't you do that when the Federal Government raised the question?

A Well, they all were on the courses that were offered. The class rosters we used to determine, in fact, initially who was enrolled there during that period of time. Classes were offered at the prison and we assumed that they were located there. I know of one case in the 10 years I'm involved with the program where there was a student who was living downtown.

Q Was that during 80/81?

A I think it was prior to that.

Q But in any event, do I understand that you know of nobody including anybody at H.A.C.C. who's actually done anything more than make the assumption. Is that correct?

A. That's right.

(James deposition, pps. 37–38).

Defendant accordingly argues that a prompt investigation at the time the government was seeking reimbursement would have revealed who among the prisoners were paying their own room and board and who would have therefore been entitled to the application of the $1,100 factor. HACC's liability would therefore have been correspondingly reduced.

This would have been a persuasive argument in defendant's behalf but unfortunately it falters on the sufficiency of the evidence to support it. As noted, defendant has the burden of proving prejudice. The mere possibility of prejudice is not sufficient. *Morales v. National Grange Mutual Insurance Co.*, 176 N.J.Super. 347, 423 A.2d 325 (Law Div. 1980). Defendant must show not only the loss of a substantial defense opportunity but also a likelihood of success in defending liability or damages if that opportunity had been available. *Trustees of the University of Pennsylvania v. Lexington Insurance Co.*, 815 F.2d 890 (3d Cir.1987) (citing *Morales* while interpreting *Brakeman* ). The portion of the James deposition referred to does not establish the likelihood that the federal government's claim could have been successfully defended, or reduced, by showing

that some of the prisoners were residing outside the prison. It does raise that possibility. But that is not sufficient, in our view, to carry defendant's burden of proving prejudice. In light of *Lexington, supra*, defendant should have presented evidence tending to show that the defense, in fact, existed.[5]

Defendant's next argument concerning prejudice is that delay prevented an investigation to determine if the prisoners could reimburse HACC. The student prisoners are now for the most part scattered and unable to be located. In response, plaintiff refers to the "Coverage" section, I.1, of the policy, which provides that defendant would "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as 'Damages'...." Damages, in turn, is redundantly defined as "any amount which an Insured is legally obligated to pay...." Plaintiff points out that, because of its failure to follow the proper procedure, it is liable directly to the government for any overpayment of a Pell Grant. *See* 34 C.F.R. § 690.79(a)(2). Accordingly, its repayment to the government is covered under the policy and any possibility of collecting from the students is left up to the defendant in deciding to exercise its subrogation rights under the contract. We agree with plaintiff.

Defendant next argues that it was prejudiced by plaintiff's failure to exhaust administrative remedies. It claims that the provision of 20 U.S.C. § 1094(b) then in effect referring to civil penalties, and the enforcing regulations at 34 C.F.R. § 668.71 *et seq.*, applied to HACC's situation and that certain administrative remedies set forth in the regulations were not pursued. We agree with plaintiff, however, in concluding that HACC's liability to the federal government, consisting of reimbursement of Pell Grant funds, simply did not constitute a civil penalty or fine. The administrative procedures were therefore inapplicable.

Defendant's final argument on prejudice is that it was denied the opportunity to negotiate the payment of a lesser amount. As already noted, the amount of reimbursement was set by a simple arithmetical calculation. Further, defendant fails to assert specific grounds upon which it would have argued for a lesser reimbursement. This is too amorphous a claim of prejudice and we reject it. *See Lexington, supra.*

If the result on this aspect of the case seems unduly harsh to defendant, which understandably resisted paying a claim of which it had no knowledge and could not control, it must be remembered that, without prejudice, the reason for the notice and consent provisions does not exist. *See Compagnie Des Bauxites v. Insurance Company of North America*, 794 F.2d 871, 875 (3d Cir.1986). *See also* note 3, *supra*. To decide otherwise would also defeat "the second rationale of *Brakeman*," avoiding forfeitures. *Compagnie Des Bauxites, supra*, 794 F.2d at 875.

### B. *HACC Did Not Gain From Its Erroneous Calculation of Pell Grant Funds.*

■ Exclusion 1 of the policy provides that the policy shall "not apply to any claim

---

5. The depositions taken by defendant establish that PEIC could have pursued further discovery on this issue. Michael Klunk, an assistant dean, mentions Calvin Williams, director of education at the prison, in his deposition as having knowledge bearing on the housing status of prisoners. Klunk also provides information that would not have been favorable to defendant. For example, he testified that HACC was told to run a series of courses over an eighteen to twenty-four month period "because that seemed to be the traditional cycle of the general population [at the prison]." (Klunk deposition, p. 12) (brackets added). He also stated that Williams decided that "the inmates should have a commitment and most semesters he asked that that commitment be five or ten dollars a semester." (Klunk deposition, p. 15). According to Klunk, Edwards further decided to solicit funds, resulting in periodic contributions from Christian Churches United, because Williams concluded "we could not ask the inmates for any more money while they were incarcerated, that he was going to have to solicit funds." (Klunk deposition, p. 17). These statements support the conclusion that none of the prisoners were living outside the prison, holding down jobs and paying for their own expenses at a halfway house. While we do not rely upon them in disposing of the motions because they are hearsay, *see Nadler v. Baybank Merrimack Valley, N.A.*, 733 F.2d 182 (1st Cir.1984), they do indicate that if PEIC had pursued such a defense, it would have been fruitless.

made against the insured based upon or arising out of the insured gaining in fact any personal profit or advantage to which the insured is not legally entitled." Defendant argues that the Pell Grants were advantages to which HACC was not entitled and was therefore not insurable under the policy. PEIC also argues that plaintiff suffered no loss since the overpayments represented money HACC was not entitled to in the first place. Defendant implies that HACC would have conducted the academic program at the prison in any event and that therefore the Pell grant funds were a bonus of sorts. Defendant also relies upon the fact that no money was ever actually given to the prisoners since HACC received the Pell Grant money and allocated it to the prisoners' accounts.

We reject this argument. Klunk's deposition makes clear that the College was sensitive to the financial aspect of offering classes at the prison. The program was only initiated after the Commonwealth of Pennsylvania first provided funding. Thereafter, in some years the program was not offered at all. That HACC routinely did not collect the full costs of the program from the students does not mean that the reimbursement it received from the federal government was profit or gain to HACC. Moreover, HACC was not engaging in creative bookkeeping, as defendant derisively implies. The College provided a service to the student prisoners. It established accounts in their names and credited the accounts with funds received under the Pell Grant program. It is irrelevant that no cash changed hands. The College has suffered a loss to the extent that it has not received compensation for services rendered.

C. *The Exclusion For Contractual Obligations Does Not Apply.*

Exclusion 5 provides that PEIC is not responsible "for any amounts due under the terms of any contractual obligation." Defendant argues that this exclusion prohibits plaintiff's recovery under the policy because HACC's obligation to repay the government arose from the Program Participation Agreement it signed. Plaintiff

counters that the Agreement merely incorporates its duty under the regulations and in those circumstances the exclusion does not apply, citing *Daily Express, Inc. v. Northern Neck Transfer Corp.,* 490 F.Supp. 1304 (M.D.Pa.1980). We agree with plaintiff.

We will issue an appropriate order.

ORDER AND JUDGMENT

AND NOW, this 25th day of March, 1988, upon consideration of the parties' cross-motions for summary judgment, it is ordered that:

1. Defendant's motion for summary judgment is denied.

2. Plaintiff's motion for summary judgment is granted.

3. Judgment is hereby entered for plaintiff in the amount of $92,772.00, plus interest from March 13, 1986 and costs.

4. The Clerk of Court shall close this file.